Filed 6/3/16  In re N.D. CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| In re N.D., a Person Coming Under the Juvenile Court Law. | H043026 (Santa Clara County Super. Ct. No. JD23399) |
| SANTA CLARA COUNTY DEPARTMENT OF FAMILY AND CHILDREN'S SERVICES,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>D.D.,<br><br>        Defendant and Appellant. | |

D.D. (mother) appeals the order declaring N.D. (child) (born 2014) a dependent of the juvenile court and removing child from her parents' custody pursuant to Welfare and Institutions Code[1] section 300 and section 361.  She contends the evidence was insufficient to support the jurisdictional findings under section 300, subdivisions (a), (e), and (i).  She also contends she was prejudiced by ineffective assistance of counsel after new facts emerged that would have altered the juvenile court's findings.  We conclude that substantial evidence supported the jurisdictional findings and that mother has not established ineffective assistance of counsel on direct appeal.

---

[1] Unspecified statutory references are to the Welfare and Institutions Code.

# I. FACTUAL AND PROCEDURAL BACKGROUND

*October 2014 Referrals*

Child was seven months old, living with mother and maternal grandmother (grandmother) in Mountain View, when first referred to the Santa Clara County Department of Family and Children's Services (the Department). Child's father did not live with them but was in a relationship with mother and visited, also assisting with child's care. When mother worked at a seasonal job in November 2014, father and grandmother took turns caring for child.

The first referral stated that child had a black eye and an untreated cold. The investigating social worker observed child had a "faint, insignificant mark under [the] right eye" and did not appear to be in pain. The social worker observed no additional marks and noted child appeared healthy and well cared for. Mother explained that the eye bruising occurred when child was napping on grandmother's bed, fell off, and hit a small television dinner table. Mother reported that she no longer placed child in grandmother's room for naps and had lowered her own bed to a safe height for child to sleep. The social worker found the general neglect allegation was inconclusive and the physical abuse allegation was unfounded.

Ten days later, a mandated reporter referred child for a black eye that appeared "fresh" and bruises on the face that appeared to be healing. The referent observed mother handle child in a "rough manner" and stated that mother appeared to be developmentally delayed and had a history of dropping child, who had fallen off the bed, out of the car, and out of the highchair. The Mountain View police investigated and concluded the injury appeared to be the same that the Department had investigated already. Child appeared happy and well cared for. The Department deemed the case "inconclusive" and advised there would be further home visits. The Department provided the family a permanent crib for child.

*December 31, 2014 Protective Custody*

Child was nine months old when mother and grandmother took her to the hospital for a leg injury. They were visiting family in Bakersfield for the New Year holiday. Mother and grandmother reported that grandmother had slept with child on the couch the night before, and grandmother said she had grabbed child by the leg when child started to fall. Grandmother then heard a pop. Mother reported she was asleep at the time and did not know anything.

The medical team determined child abuse could not be ruled out. X-rays showed child's right hip bone was angulated and not in the right place—an injury not typically seen in an infant or young child—and child's ankle had a "crush injury." Child had multiple scratches to her neck, which grandmother attributed to other children in the household. The hospital transferred child to Valley Children's Hospital in Madera for evaluation by a pediatric orthopedist. Child was placed into protective custody. Child's physician at Valley Children's Hospital, Dr. Philip Hyden, observed what appeared to be nonaccidental trauma to the ankle and hip, and other, possible healing fractures on the x-rays.

Mother told the doctor and social worker that child had previously fallen out of a stroller face-forward going down stairs when mother had not strapped her tightly enough. Mother denied any intentional trauma or physical discipline of child. She explained that she was child's primary caretaker, though she had no concerns with grandmother watching child. Grandmother confirmed the stroller fall and explained they had taken child to the doctor and dentist at that time. During the hospital stay, staff were concerned that mother was not attentive to child and left child on the hospital bed with the rail down despite her history of falls. Ambulance staff reported that mother displayed "aggressive behavior" toward child during transit to the children's hospital.

Dr. Hyden reported the initial MRI and bone survey results: (1) subacute fracture on the right hip; (2) subacute distal fracture of the right femur; (3) distal tibial fracture

3

with swelling; (4) proximal femur fracture; (5) subacute eighth rib fracture; and (6) undetermined first and ninth rib fractures.[2] The subacute fractures were in the healing stages. The proximal femur injury (close to the pelvis) was not consistent with the reported fall. The distal tibial (ankle) fracture was more commonly seen in child abuse. Child was placed in a spica cast (extending down from the chest) on both legs.

The police interviewed mother, grandmother, and relatives in Bakersfield. Grandmother described bringing child onto the couch to sleep because child had been fussy, and grabbing child when she began to fall. Mother again said she was sleeping on the floor and did not see what had happened, though she noted that children in the apartment were "horse playing" that night, and mother's one-year-old niece stepped on child's leg. Child cried but was playing and active after. A relative reported that her five-year-old son was downstairs playing that night, and when she called him upstairs he told her that "grandma" stepped on child, making child cry. The boy told the officer the same story.[3]

The social worker spoke with father, who was working and living in San Francisco at the time. He visited child two to three times a month. He had no concerns about child's care with mother or grandmother and said child was always happy. He had last seen child on Christmas Eve and Christmas day.

*Section 300 Petition and Jurisdiction Reports*

Kern County Department of Human Services (DHS) filed a dependency petition on January 5, 2015, alleging that child was a person described under section 300,

[2] Only three of these fractures were later confirmed, as explained *post*.

[3] The police report documented the conversation: "I asked . . . who grandma was to him and he identified her by description . . . . I asked him if he saw [child] cry last night and he said yes. I asked him what caused her to cry and he said he saw [grandmother] step off the couch last night while [child] was on the floor, stepping on her. He could not describe where [child] was stepped on but that he saw her cry. He said grandma then picked her up and laid with her on the couch."

subdivisions (a), (e), and (i).  On January 6, 2015, the juvenile court heard the petition, declared father to be a presumed father, and ordered child to be detained and mother and father to receive supervised visitation.  Mother agreed to out-of-county placement. Mother informed the court that child might have Native American ancestry.[4]  Mother tried to understand how she could have failed to notice child's injuries and contacted child's pediatricians in Santa Clara County several times to ask why the healing fractures would not have not been discovered based on signs of pain or crying, because child was playing and acting fine at Christmas.

DHS filed a social study dated January 29, 2015 and supplemental studies dated February 9, March 3, May 14, and July 7.  The January 29 study excerpted child's December 31, 2014 hospital records and the Department records from October 2014. The study reflected the doctors' assessments that "child abuse cannot be ruled out" and the injuries appeared to be "nonaccidental trauma" and suspicious because "for the ankle to be broken how and where it was broken, a lot of pressure had to be applied. . . .  [I]t appeared the ankle was either stepped on by a larger person or a large amount of pressure was applied to the ankle."  Hospital staff reported that mother had trouble grasping their concerns and the etiology of child's injuries, and grandmother had acknowledged the baby had fallen two times before.

In the police investigation, Dr. Hyden stated that grandmother's actions may have caused the ankle fracture, but the hip and rib injuries were not accounted for.  Dr. Hyden explained to the social worker that the eighth rib fracture was caused by compression or squeezing to the chest and that falls do not cause rib fractures.  He described the injury to the hip as "trauma not accidental" and explained that mishandling of a child severe enough to affect the hip bone is significant because it is one of the strongest bones.

_____

[4] Notice was sent to the appropriate agencies and tribal organizations.  The court later determined that child was not subject to the Indian Child Welfare Act.

The social study concluded that child had suffered several substantial injuries and mother had been unable to provide an explanation which was consistent with the injuries.

At a supervised visit in January 2015, the social worker reported the parents "showed good parenting skills and were both very patient and loving towards baby." In February 2015, child's placement in the home of her maternal grandfather (grandfather) and his wife (step-grandmother) was approved. During a supervised visit, mother briefly left child unsupported on a bench and child fell forward, hitting her face and forehead on the carpet. Mother told the social worker that she understood the need to constantly supervise little children and to protect them. At another visit that included grandmother, the social worker observed mother following grandmother's lead on how to interact and care for child. Mother told the social worker that grandmother had watched the baby "only once in a blue moon."

Father agreed to drug testing and tested negative in February and March. Mother began a physical abuse as a perpetrator class and a 52-week parenting without violence program, but was terminated after a few classes for failing to take responsibility and for claiming she was falsely accused. Father was hospitalized in February and diagnosed with a brain tumor; he was having seizures and struggled to travel for services and to the drug testing location. By late June, father had failed to complete required drug testing and was terminated from his parenting course due to poor attendance.

Step-grandmother complained to the social worker regarding visitation, stating mother and father had to be asked to check child's diaper and that child was not safe with mother. Mother admitted that she had placed child on the counter at Chuck E. Cheese during a visit, but said she was holding child against her stomach while she spoke with the manager, and step-grandmother had snatched child from her. Mother denied the other issues that step-grandmother raised.

*Jurisdiction Hearing*

The contested jurisdiction hearing was on July 13, 2015.[5] The first witness was Dr. Hyden. Dr. Hyden was board certified in child abuse pediatrics and general pediatrics and had practiced since 1987. Dr. Hyden testified that child had three fractures. The acute fracture of the right ankle (distal tibial fracture) was "brand-new" and had been sustained close to the day that child was hospitalized. Grandmother's explanation of having grabbed child by the ankle to prevent child from falling, while "very suspicious, . . . could explain the injury."

The two other fractures were healing fractures. The injury to child's right hip (proximal femur fracture) affected the growth plate of the upper part of the femur, which had "slipped" where it goes into the pelvis. Because the injury was older, grandmother's reported action could not account for the hip injury. Dr. Hyden explained that to cause the hip injury would take a "lot of force," though "there's always exceptions to the rule." He explained that child did not have any abnormality that would make child susceptible to such an injury,[6] and the only explanation he found was "forceful trauma in someone trying to grab that part of the thigh up near the femur . . . ." The hip injury would have caused stiffness and maybe some slowness and discomfort but would not have kept child from being able to move if she was able to move at that age.

Child also had a healing eighth rib fracture. Dr. Hyden estimated that the hip and rib fractures were at least more than seven days old, possibly closer to two weeks old.

---

[5] The jurisdiction hearing was continued two times due to the unavailability of the testifying medical witness.

[6] Child's medical records and the Kern County social study indicated that child had numerous "café au lait" spots at birth and was referred to a genetic counselor for Neurofibromatosis (NF-1), which father also had. The genetic counselor stated that Neurofibromatosis could cause bowing below the knee cap and the bone could appear thinner in appearance in the tibia and fibula. The medical testimony at the jurisdiction hearing did not reference child's NF-1 diagnosis.

Dr. Hyden excluded the other initially-suspected fractures on the first and ninth rib and an abnormality of the tibia because they did not show on follow-up films.

Dr. Hyden opined he was "very concerned about the possibility of non-accidental trauma" given the history of falls, multiple scratches of different ages on the face and neck reportedly from other children in the home, and fractures for which there was "no explanation," though grandmother's explanation for the ankle fracture "could be true." On cross-examination, Dr. Hyden stated that he could not "prove" the injuries were abusive but "[r]ib fractures are usually caused by forceful compression enough to cause enough loading on the angle of the rib that it causes it to break. The femur fracture usually takes a lot of force because—or a blow to that area because it's not easy to break the hip." He testified that posterior rib fractures "don't usually happen from falls." Dr. Hyden attributed the injuries to "neglect or inadequate supervision" given child had a history of falls yet "was still put into precarious situations that you don't put a nine-month-old" and was allowed to be around other children and persistently scratched or pinched.

Mother testified that she was child's primary caretaker and they lived with grandmother. During the time frame based on Dr. Hyden's testimony, child was always in mother's care. At the time of child's ankle injury, child was not yet very mobile, but could crawl and had taken a few steps with a walker. Mother had no explanation for the rib or hip fractures. Mother acknowledged one incident when child fell off of the bed, resulting in a mark under the eye. Mother also described when child fell out of the stroller because mother had not strapped her securely. Mother felt "scared and upset and angry with myself," and called grandmother who said they should take child to the doctor, which they did. The stroller accident occurred around November 7 or 14. Mother agreed "a little bit" that she should have been more attentive and made sure child was safe. Mother testified that she had never hurt child.

8

At the conclusion of testimony, mother's counsel asked the court to strike from the allegations in the petition any references to fractures other than the three fractures that Dr. Hyden's testimony confirmed. There was no objection. Counsel for mother and father each argued there was insufficient evidence to sustain the physical abuse or severe physical abuse allegations. Mother's counsel suggested the court instead might find a section 300, subdivision (b) allegation indicating inadequate supervision. Father's counsel argued there was insufficient evidence to sustain the allegations of cruelty. DHS responded that there was overwhelming medical and circumstantial evidence that "whether this is mom being neglectful herself or whether this is mom doing it herself, someone is physically abusing this child." DHS further argued as to the cruelty allegation that "to have a nine-month-old subjected to all of these injuries . . . is cruel by a preponderance . . . ."

The juvenile court sustained the petition in its entirety. The court cited Dr. Hyden's testimony regarding the force required to cause the hip and rib injuries: "It's not just something that falling off a bed would cause." The court observed as to the ankle injury that Dr. Hyden "was reticent in his acceptance of the grandmother's explanation . . . . And I think it's reasonable to conclude, but for other information, the determination that it was perhaps accidental is—is one explanation that could be given to it." The court concluded, "I think the preponderance of the evidence is this child is the victim of intentional injuries." The case was transferred to Santa Clara County for disposition.

*Transfer, Disposition, and Addendum Reports*

Santa Clara County juvenile court accepted transfer of the case on August 26, 2015. Mother and father were then living together at grandmother's home in Santa Clara County. Mother reiterated to the Department social worker that she did not know how child had been injured and would not admit she had hurt child in order to participate in services, calling the DHS reports "all lies." Father and mother voluntarily underwent

9

drug testing; both tested negative. Child remained in the care of grandfather and step-grandmother in Stockton, who reported child was thriving.

Father and mother began participating in recommended services in Santa Clara County. Mother was going to school to become a medical assistant. Father was cleaning houses and in treatment for his brain tumor and seizures. There were two pending criminal charges against mother, both from February 2015. The first charge was battery (Pen. Code, § 242), which mother explained resulted from an altercation with a stranger at Walmart. Mother claimed self-defense and believed the charge was going to be dropped. The second charge was driving with a suspended/revoked license (Veh. Code, § 14601.1). Father had no known criminal convictions or pending charges.

The social worker assessed the parents as highly motivated toward reunification. Both parents completed the intake process for a child abusers treatment program. They had participated in several, four-hour supervised visits once a week and displayed appropriate behavior toward child, who enjoyed the visits. They had support from their extended families, were in a committed relationship, and showed a positive pattern of bonding with child. They remained unable to state who perpetrated the injuries.

The social worker noted that although the petition was sustained against mother, other people had contact with child and mother had not been the primary caretaker in November 2014. Father was not named in the petition allegations but had substantial contact with child during the time that the healing injuries would have occurred. The worker recommended a psychological evaluation for mother, participation for both parents in a 52-week child abusers treatment program, and counseling.

An addendum to the disposition report, dated October 5, 2015, indicated that mother and father were engaged in case plan services. Though mother was initially defensive at the child abusers treatment program, she had opened up and admitted that she was neglectful, at times, of child. Child remained in a stable placement with

10

grandfather and step-grandmother.  The social worker maintained the recommendations of the disposition report.

*October 29 Addendum Report*; *Grandmother's Confession*

A second addendum report dated October 29, 2015 (October 29 addendum report) stated that grandmother had admitted responsibility for child's injury on December 31, 2014.  Grandmother told the social worker that she resented father and child and had an underlying anger toward them.  She had encouraged her daughter to get an abortion when she became pregnant because mother had been doing well in college courses at the time.  She also had questioned her daughter's ability to parent, but found she was a good mother and attentive to child.  She told the social worker that one time she threw child on the couch in front of mother to hurt mother.  Child cried, and mother left for two days with child.  She admitted sometimes advising mother not to comfort child.  Grandmother said, "I don't know why I did the things I did."

Grandmother then explained that on the day of child's ankle injury, grandmother had been drinking and became angry.  She purposely stepped on child's ankle with the intent to hurt her.  Child had cried louder than ever before and was difficult to console, so grandmother pulled child onto the couch to sleep.  As grandmother began to fall asleep, she felt child falling; she grabbed child's leg and heard a pop.  Grandmother felt "overwhelming guilt" because mother was taking the blame.  Grandmother said mother and father did not know she had hurt child.  Grandmother knew she needed counseling and wanted to get help.

Grandmother told mother that she was responsible for child's injury.  Mother expressed shock.  Mother told the social worker that she knew grandmother had resentment toward child and was upset when mother became pregnant.  Mother described the incident when grandmother grabbed child by the torso and threw child on the couch, which occurred "slightly before Thanksgiving."  After that, mother left with child for two days and stayed with a friend.  When they returned she talked with grandmother who was

11

remorseful. Mother believed that grandmother would not hurt child again and never suspected grandmother. However, mother admitted that grandmother angered easily and "needs help." Mother had not told father about the incident when grandmother threw child on the couch.

Grandmother contacted the social worker on October 22 to report that she had moved out of the residence with mother and father and had enrolled in a voluntary, 16-week child abusers program. The social worker requested a review of child's medical records in light of grandmother's statements. The responding physician reported that grandmother stepping on the ankle would be sufficient to cause the fracture seen on December 31, 2014, but would not account for the healing fractures that had occurred probably two weeks earlier. Grabbing and throwing child could account for the hip fracture and possibly the rib fracture, depending on where child had been grabbed and what impacted child.

Father was informed of grandmother's confession. The social worker suggested the possibility of family maintenance services for father if he could find a stable place to live where child could be kept safe. Mother would continue to receive reunification services due to her knowledge of grandmother's propensity to anger and violence toward child in November 2014. Father told the social worker that he and mother wanted to continue living together and working on reunification efforts together.

The social worker recommended that father continue counseling and attend a reduced, 16-week parenting without violence program. The worker recommended that mother continue the 52-week child abusers treatment program, psychological evaluation, and counseling. The worker noted that not all of child's injuries had been explained, due to the time frame of the November incident and the estimated age of the healing fractures.

*Disposition Hearing*

The parties reached a settlement on October 29, 2015, the day of the disposition hearing. The settlement indicated some changes to the case plan, including that mother

attend a 16-week parenting without violence program instead of the 52-week program. Counsel for all parties presented argument and submitted the matter to the juvenile court.

Having reviewed the reports and addendum reports, the juvenile court remarked that at the time of the jurisdictional findings, child's injuries were inadequately explained and the suspected perpetrators were mother, father, and grandmother. Despite the newly discovered information, the court was concerned that grandmother's actions did not account for all of child's injuries. The court found that mother was aware of at least one of the prior incidents yet continued to allow grandmother to care for child. The court declared that clear and convincing evidence required child to be removed from parents' physical custody, and that the court would follow the recommendations of the case plan.

The juvenile court declared child to be a dependent, removed custody, and ordered reunification services for child, father, and mother. The court granted a request by child's counsel to enter a temporary restraining order to prevent any contact by grandmother with child. Child's counsel requested issuance of a permanent restraining order in November 2015, which mother and father opposed. The court entered a permanent restraining order against grandmother on December 9, 2015.

Mother filed a timely notice of appeal on November 12, 2015 and filed an amended notice of appeal on December 24, 2015.

## II.      DISCUSSION

Mother contends there was no substantial evidence to support a true finding on the allegations of the petition. Mother also contends she was prejudiced by her counsel's failure to seek a new hearing as to the jurisdictional findings after grandmother admitted to intentionally harming child. The Department asserts there was substantial evidence to sustain the findings on the petition, even after grandmother's confession, such that counsel's failure to seek a new jurisdictional hearing was not prejudicial.

13

### A. JURISDICTIONAL FINDINGS

The juvenile court may take dependency jurisdiction over a child only if the court finds the child to be a person described by one or more of the section 300 subdivisions. "The basic question under section 300 is whether circumstances at the time of the hearing subject the minor to the defined risk of harm." (*In re Nicholas B*. (2001) 88 Cal.App.4th 1126, 1134.) It is the Department's burden to prove the jurisdictional facts by a preponderance of the evidence. (§ 355, subd. (a); *In re I.J*. (2013) 56 Cal.4th 766, 773.) We review the jurisdictional findings on appeal for substantial evidence, viewing the evidence in the light most favorable to the juvenile court's order and affirming if " 'there is reasonable, credible evidence of solid value to support them.' " (*In re Jonathan B*. (2015) 235 Cal.App.4th 115, 119; *In re J.N*. (2010) 181 Cal.App.4th 1010, 1022.)

" 'When a dependency petition alleges multiple grounds for its assertion that a minor comes within the dependency court's jurisdiction, a reviewing court can affirm the juvenile court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence. In such a case, the reviewing court need not consider whether any or all of the other alleged statutory grounds for jurisdiction are supported by the evidence.' " (*In re I.J*., *supra*, 56 Cal.4th at p. 773; *In re Alexis E*. (2009) 171 Cal.App.4th 438, 451.) Accordingly, in the present case, the juvenile court's finding of dependency jurisdiction may be upheld if there is substantial evidence based on any one of the three grounds alleged in the petition. We find substantial evidence supports jurisdiction on all three grounds.

#### 1. Section 300, Subdivision (a)—Substantial Risk of Serious Physical Harm

The court may exercise dependency jurisdiction pursuant to this subdivision if the court finds that "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm inflicted nonaccidentally upon the child by the child's parent or guardian." (§ 300, subd. (a).) A finding of substantial risk of serious future

14

injury may be "based on the manner in which a less serious injury was inflicted, a history of repeated inflictions of injuries on the child or the child's siblings, or a combination of these and other actions by the parent or guardian that indicate the child is at risk of serious physical harm. . . ." (*Ibid*.)

Mother contends there was no substantial evidence that she, as the "child's parent" in the language of subdivision (a), personally and nonaccidentally inflicted serious physical harm on child, or placed child at substantial risk of such harm. She argues that a finding under subdivision (a) requires evidence that mother herself caused child's injuries by her volitional acts. And although a finding pursuant to section 300, subdivision (a) can arise from a presumption under section 355.1, mother argues the presumption could not have applied because there was no notice or opportunity to rebut.

We agree there was no application of the presumption here. We nevertheless find substantial evidence supported the juvenile court's finding under this subdivision.

The presumption under section 355.1 applies when competent professional evidence shows the child suffered an injury that "would ordinarily not be sustained except as the result of the unreasonable or neglectful acts or omissions of" a parent or other person who has the care of the child. (§ 355.1, subd. (a); *In re A.S.* (2011) 202 Cal.App.4th 237, 242.) Such evidence serves as prima facie evidence the child is a person described by section 300, subdivision (a), (b), or (d). (§ 355.1, subd. (a).) It creates a rebuttable presumption that shifts to the parent the burden of raising an issue as to the actual cause of the injury. (§ 355.1, subd. (c); *In re A.S.*, *supra*, at p. 243.)

Even though the facts and medical evidence presented at child's jurisdiction hearing might have presented a prima facie case under section 355.1, the petition did not cite section 355.1, nor did DHS notify the parents or the court at the hearing that it would be seeking a prima facie finding under that section. The section 355.1 presumption therefore did not apply, and it was DHS' burden to show by a preponderance of the

15

evidence that child was a person described by section 300, subdivision (a). (See *In re A.S.*, *supra*, 202 Cal.App.4th at p. 244.)

Mother argues that section 300, subdivision (a) is directed only at volitional action by the parent or guardian. We agree. By its terms, section 300, subdivision (a) contemplates nonaccidental action by the parent or guardian, which causes or creates a substantial risk of causing serious physical harm to the child. (*In re Giovanni F*. (2010) 184 Cal.App.4th 594, 599, fn. 4 ["when the violent perpetrator is not a parent, section 300, subdivision (a) is inapplicable" because subdivision (a) refers to " 'harm inflicted . . . by the child's parent' "]; *In re Roberto C*. (2012) 209 Cal.App.4th 1241, 1255 (*Roberto C*.) ["Subdivision (a) requires that the harm be inflicted by the child's parent or guardian."].)

Dr. Hyden testified that the hip and rib injuries were "very concerning for non-accidental trauma." Because of the amount and type of force required to cause both the hip and rib injuries, and without an explanatory history, Dr. Hyden only could conclude they were caused by forceful trauma. Dr. Hyden estimated that based on the amount of callous (healed bone) showing on the x-rays, child's hip and rib injuries occurred within 10 days to two weeks before the December 31 hospital visit, though the injuries could have occurred up to a month before.

Notably, mother's testimony as to the critical time frame in which the hip and rib injuries likely occurred indicated that she was exclusively in charge of child's care. When asked by her counsel if she understood Dr. Hyden's testimony "that those injuries occurred sometime between maybe ten days prior to the date you took [child] to the hospital up to maybe a month or so," mother responded "Yes." Counsel then asked, "Was [child] ever not in your care in that period?" Mother: "No." Counsel: "[Child] was always in your care?" Mother: "Yes." Counsel: "You didn't leave [child] with the dad or with—" Mother: "No." Counsel then asked, "do you have any explanation for what happened to [child]?" And mother responded, "No. I don't."

16

Other evidence as of the jurisdiction hearing indicated that child had been subject to more than one fall and to acts by mother that created a risk of serious physical harm. During child's hospital stay, staff noted that mother left child alone on the hospital gurney with the sideguards down. Ambulance staff reported concerns "at the aggressive behavior" mother displayed toward child while in transit. Mother told the doctors and social worker that child had fallen from child's stroller while going down steps because mother had not secured child properly. The second referral in October 2014, deemed inconclusive by the agency, stated that mother handled child roughly and child had a history of falls, including falling off the bed, out of the car, and out of the highchair.

In reviewing a challenge for the sufficiency of the evidence, " ' "we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court . . . ." ' " (*In re I.J.*, *supra*, 56 Cal.4th at p. 773; see also *In re Kristin H.* (1996) 46 Cal.App.4th 1635, 1649 (*Kristin H.*) [" 'All conflicts must be resolved in favor of the respondent and all legitimate inferences indulged in to uphold the verdict, if possible.' "].) Mother did not equivocate that child was in her care during the month of December 2014 when the most serious injuries occurred according to the medical evidence. Drawing all reasonable inferences from mother's testimony, the unexplained hip and rib fractures, and various reports that mother mishandled child or placed child in precarious positions, we conclude substantial evidence supports the juvenile court's finding that child had suffered or was at substantial risk of suffering "serious physical harm" as a result of mother's nonaccidental actions. (See § 300, subd. (a).)

## 2. Section 300, Subdivision (e)—Severe Physical Abuse of a Child Under The Age of Five Years

Mother also challenges the juvenile court's finding pursuant to section 300, subdivision (e). A child is described by subdivision (e) who "is under the age of five years and has suffered severe physical abuse by a parent, or by any person known by the parent, if the parent knew or reasonably should have known that the person was

17

physically abusing the child." (§ 300, subd. (e).) "Severe physical abuse" may include "any single act of abuse which causes physical trauma of sufficient severity that, if left untreated, would cause permanent physical disfigurement, permanent physical disability, or death" or "more than one act of physical abuse, each of which causes bleeding, deep bruising, significant external or internal swelling, *bone fracture*, or unconsciousness . . . ." (*Ibid*., italics added.)

Child sustained three bone fractures. Dr. Hyden determined two of those fractures to be very concerning for nonaccidental trauma, and the third fracture to the ankle to be "perhaps accidental" based on grandmother's explanation. Dr. Hyden could not confirm whether the rib and hip fractures resulted from the same incident or separate incidents that occurred within close proximity of each other.

Mother does not challenge the implicit conclusion, based on the juvenile court's true finding under subdivision (e), that the hip and rib fractures were "bone fracture[s]" that could have resulted from "more than one act of physical abuse."[7] (§ 300, subd. (e).) Mother instead argues that because she did not know who caused child's injuries, and there was no indication of how she would have discovered the injuries, there was no evidence that she had any knowledge of the apparent abuse.

Several courts have examined the degree to which a parent must have knowledge of the abuse under subdivision (e) of section 300. "The subdivision does not require the parent's actual or constructive knowledge that the minor in fact suffered severe physical abuse within the statutory definition." (*In re Joshua H*. (1993) 13 Cal.App.4th 1718, 1729 (*Joshua H*.).) In *Joshua H*., the mother had seen her boyfriend slapping and striking the child, and thus was aware of abuse, even if she did not know of its severity.

_____

[7] The ankle fracture—later confirmed a result of grandmother's intentional act— was at the jurisdiction hearing still suspected to be nonaccidental trauma, as the court made clear when it referenced Dr. Hyden's "reticent" acknowledgment of grandmother's explanation as "one explanation that could be given to it."

18

As the court observed, "several of the listed injuries, such as bleeding (internal), internal swelling, and bone fracture, may not be visible; they may be discovered only after medical examination or testing." (*Ibid*.) *Joshua H*. concluded: "When, as here, an infant suffers severe physical abuse at the hands of someone other than a parent, the minor is subject to juvenile court jurisdiction if the abuser was known by the parent and the parent knew or reasonably should have known that the abusive person 'was physically abusing the minor.' (§ 300, subd. (e).)" (*Ibid*.)

Nor does the statute require actual knowledge of the perpetrator of the child's injuries. "[W]here there is no identifiable perpetrator, only a cast of suspects, jurisdiction under subdivision (e) is not automatically ruled out. A finding may be supported by circumstantial evidence . . . ." (*In re E.H*. (2003) 108 Cal.App.4th 659, 670 (*E.H*.).) In *E.H*., there was "no evidence that anyone knew that anything was happening" to the child, who had sustained multiple fractures that the juvenile court found were "*intentionally* inflicted . . . by someone in the household . . . ." (*Id*. at p. 667.) The court upheld the jurisdictional finding under subdivision (e), explaining: "the child was never out of her parents' custody and remained with a family member at all times; therefore, [the parents] inflicted the abuse or reasonably should have known someone else was inflicting abuse on their child . . . ." (*Id*. at pp. 669-670.) Similarly in *K.F. v. Superior Court* (2014) 224 Cal.App.4th 1369, 1383, substantial evidence existed to uphold a finding under subdivision (e) against the father based on his frequent contact with the mother and "hands-on participation" in their child's care, giving him "a substantial opportunity to either commit the abuse or become aware that the abuse was occurring."

On the other hand, "[t]he recognition that circumstantial evidence may support a finding despite the inability to identify the perpetrator does not . . . lead to the conclusion that a court may presume" that the parent knew, or should have known, of the abuse and source of abuse, to support a finding against the parents. (*Roberto C*., *supra*, 209 Cal.App.4th at p. 1255.) The court in *Roberto C*. affirmed the juvenile court's dismissal

19

of the section 300 petition after finding no substantial evidence providing "any basis to attribute knowledge to these parents that Roberto was being abused . . . within the meaning of the statute." (*Roberto C*., *supra*, at p. 1254.)  In *Roberto C*., the juvenile court had found no evidence linking the parents to the injuries of their nine-month-old son, and questioned the credibility of the evidence presented to show the parents knew the child had been abused.  (*Ibid*.)

Here, mother points out that child had several caretakers, received routine medical care, was evaluated by the Department social workers in October 2014, and had no outward sign of injuries until the hospital visit for child's leg, after which the bone scan revealed the additional fractures.  Mother also points to her phone calls to child's primary doctors after the fractures were discovered, seeking an explanation for how she could not have known child had been injured, as evidence that she neither knew nor had reason to know that child had suffered severe injuries.

Although these facts could support a contrary inference, they do not undermine the reasonable inference—supported by substantial evidence—that mother knew or had reason to know of physical abuse of child.  (See *In re Francisco D*. (2014) 230 Cal.App.4th 73, 82 [reviewing court draws all reasonable inferences from the evidence to support the findings of the dependency court "[e]ven if contradictory evidence exists"]; *In re I.J*., *supra*, 56 Cal.4th at p. 773.)  Mother testified at the jurisdiction hearing and told social workers that she was child's primary caretaker.  Grandmother watched child only "once in a blue moon," and mother claimed to have no concerns with grandmother's care.  This and the nature of child's injuries distinguishes the present case from *Roberto C*., in which the child had been in the care of a babysitter and had "no broken bones and no bruises.  The only visible evidence of injury was described by all parties as minor bruising, if visible at all . . . ."  (*Roberto C*., *supra*, 209 Cal.App.4th at p. 1254.)

Although there was no evidence as of the jurisdiction hearing[8] to suggest mother had seen grandmother or father hurt the baby (cf. *Joshua H*., *supra*, 13 Cal.App.4th at p. 1729), we find that like in *E.H*., mother's near-exclusive caretaking role and the type of injuries present lead to the reasonable conclusion that mother, grandmother, or father was handling child severely. (See *E.H*., *supra*, 108 Cal.App.4th at p. 670.) That child's injuries may not have been easily observable until medical treatment was required is not dispositive. (*Joshua H*., *supra*, at p. 1729; *K.F*. *v*. *Superior Court*, *supra*, 224 Cal.App.4th at p. 1383 ["requisite knowledge of the abuse" supported by the record even if the child's symptoms "might not otherwise trigger abuse concerns"].) We conclude there was sufficient, substantial evidence to maintain a finding of severe physical abuse of a child under the age of five. (§ 300, subd. (e).)

### 3. Section 300, Subdivision (i)—Acts of Cruelty

Mother also challenges dependency jurisdiction based on acts of cruelty. The juvenile court may take jurisdiction pursuant to section 300, subdivision (i) upon proof that "[t]he child has been subjected to an act or acts of cruelty by the parent or guardian or a member of his or her household, or the parent or guardian has failed to adequately protect the child from an act or acts of cruelty when the parent or guardian knew or reasonably should have known that the child was in danger of being subjected to an act or acts of cruelty."

Mother contends there was insufficient evidence under either the direct or indirect infliction prongs of section 300, subdivision (i). That is, she contends there was no evidence that she herself committed an act or acts of cruelty, or that she knew or should

---

[8] Grandmother's confession and mother's statements afterward regarding grandmother's resentment, anger issues, and the incident when grandmother threw child onto the couch, do not come into consideration in our review of the jurisdictional findings. (See *In re Nicholas B*., *supra*, 88 Cal.App.4th at p. 1134 [relevant circumstances for § 300 review are those "at the time of the hearing"].)

have known that child was at risk of being subjected to such acts. Mother again relies on her ignorance of the hip and rib injuries, in particular as reflected in the evidence that she called child's primary care physicians to ask how she would not have noticed child in a lot of pain and given that child was playing and acting fine at Christmas.

This court previously assessed an act coming within section 300, subdivision (i) when a mother tossed her seven-year-old daughter, who was terrified of the water and screaming in fear, into a park fountain and held the child under for long enough that onlookers thought she was trying to drown her. (*In re D.C.* (2011) 195 Cal.App.4th 1010, 1014, 1018 (*D.C.*).) In *D.C.* we considered whether the direct-infliction clause of this subdivision requires an intent to harm, and held that it does not. (*Id.* at p. 1017.) As to the meaning of "acts of cruelty" within the dependency context, we concluded based on the statutory language, case law, and the ordinary meaning of "cruelty" as defined in a variety of sources, that "acts of cruelty" are "intentional acts that directly and needlessly inflict extreme pain or distress." (*Ibid.*) Such acts "might be described . . . as acts that produce a shock of conscience." (*Ibid.*)

Mother suggests that there is no evidence of intentional acts that directly and needlessly inflicted *extreme* pain or that *shocked* the conscience. But "[w]hether the acts are acts of cruelty is a separate factual determination that the juvenile court makes based upon the common meaning of the phrase and the totality of the child's circumstances." (*D.C.*, *supra*, 195 Cal.App.4th at p. 1017.) The juvenile court made such a factual determination when it found the petition allegations sustained, including as to section 300, subdivision (i). Several factual findings of the court are pertinent: first, that the "hip injury required a lot of force" and was not "something that falling off a bed would cause"; second, that "injuries to the ribs require lots of force" and falling from a bed would not explain that either; third, that the explanation for the ankle fracture as accidental was questionable, noting the doctor was "reticent" to accept the explanation but did so "but for other information . . ."; and fourth, that there were "a number of other

22

injuries to this child that she is either the victim of just a lot of bad luck or negligence or I think the preponderance of the evidence is this child is the victim of intentional injuries."

Other factors forming the totality of child's circumstances further support the court's finding, including child's young age of only nine months, her attendant vulnerability, and the presence of "multiple scratches noted on [child's] face and neck of different ages and stages of healing" as recorded in child's medical record upon admission to Valley Children's Hospital. Multiple scratches on child's face and neck—whether inflicted by other children or the adults in a household—present no less evidence of cruelty to child than "a history of pinching in anger" that leaves a visible impression for several days on child's arms and stomach. (*In re Benjamin D*. (1991) 227 Cal.App.3d 1464, 1472.) In that case, the court found "these pinchings . . . entailed real physical pain on a child not yet three years old, especially in the light of the other evidence pointing to [the father's] cavalier indifference toward the infliction of physical pain on [the child]" and thus supported the dependency court's finding that the child was subjected to an act or acts of cruelty within the meaning of section 300, subdivision (i). (*In re Benjamin D*., *supra*, at p. 1472.)

So too here, we find the sum of the evidence sufficient to support the finding that child was "subjected to an act or acts of cruelty" by mother or grandmother, or mother "failed to adequately protect" child from acts of cruelty when mother reasonably should have known that child was in danger of being subjected to those acts. (§ 300, subd. (i).)

## B. INEFFECTIVE ASSISTANCE OF COUNSEL

Mother asserts that her counsel's failure to seek a new hearing on jurisdiction after grandmother confessed to intentionally harming child prejudiced the disposition and violated her right to effective assistance of counsel.

A parent's statutory right to competent counsel in a dependency proceeding, codified at section 317.5, subdivision (a), includes the right to judicial review of a claim of ineffective assistance of counsel. (*Kristin H*., *supra*, 46 Cal.App.4th at

23

pp. 1661-1662.)  We address a parent's ineffective assistance of counsel claim in two steps.  First, we examine whether trial counsel failed to act in a manner expected of a reasonably competent attorney acting as diligent advocate in the dependency context. (*Id*. at pp. 1667-1668; *In re Ana C*. (2012) 204 Cal.App.4th 1317, 1329.)  In order to bring the claim on direct appeal, as opposed to a writ of habeas corpus, the appellant must show " 'there simply could be no satisfactory explanation' for trial counsel's action or inaction." (*In re Eileen A*. (2000) 84 Cal.App.4th 1248, 1254, disapproved on other grounds by *In re Zeth S*. (2003) 31 Cal.4th 396; see also *In re Dennis H*. (2001) 88 Cal.App.4th 94, 98.)  Second, we examine whether it is reasonably probable that a more favorable outcome for the parent would have resulted, if counsel had rendered competent service.  (*Kristin H*., *supra*, at pp. 1667-1668; *In re Ana C*., *supra*, at pp. 1329-1330.)  "In short, appellant has the burden of proving both that his [or her] attorney's representation was deficient and that this deficiency resulted in prejudice."  (*In re Dennis H*., *supra*, at p. 98.)  Where, as here, a parent asserts a constitutional violation in a dependency proceeding, "the weight of authority in California applies the *Chapman* harmless error standard"[9] to evaluate prejudice.  (*In re Mark A*. (2007) 156 Cal.App.4th 1124, 1146 [citing cases].)

Mother contends that under statutory and constitutional standards, grandmother's confession required reopening of the investigation of how all of child's injuries occurred and a new hearing on jurisdiction.  She argues that the information in the October 29 addendum report refuted the jurisdictional findings based on mother's intentional acts or knowledge of such acts likely to cause serious harm to child.  As a result, mother urges that child was improperly removed based on jurisdiction findings no longer supported by

---

[9] The United States Supreme Court in *Chapman v. State of California* (1967) 386 U.S. 18, 24 held that "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt."

substantial evidence, violating mother's fundamental right of family association and fundamental liberty interest in the care, custody and control over her child. The Department concedes that mother's attorney "could have taken some action to seek amendment of the jurisdictional findings at that time" but disputes that mother was prejudiced by her counsel's failure.

Having carefully reviewed the record, including the October 29 addendum report, we are not persuaded that there was no satisfactory explanation for mother's counsel's inaction in the face of such striking information. To be sure, grandmother's confession introduced new facts and created an opportunity for counsel to investigate grandmother's credibility and to pursue new evidence on child's unexplained rib and hip fractures and multiple scratches. Mother argues that her counsel's inaction violated the standards for effective assistance, articulated in the criminal defense context in *Strickland v. Washington* (1984) 466 U.S. 668, 688-689 and *People v. Pope* (1979) 23 Cal.3d 412, 424-425,[10] whereby diligent advocacy entails a full and effective preparation of the client's case and careful investigation of all possible defenses of law or fact.

But we cannot discern from the record whether mother's counsel in fact investigated her client's position following grandmother's admissions but made "an informed tactical choice within the range of reasonable competence" (*People v. Pope*, *supra*, 23 Cal.3d at p. 425) against reopening the jurisdictional findings, perhaps in order to preserve the negotiated disposition—which included reunification services, reduced mother's 52-week child abusers treatment program to a 16-week parenting without violence course, and provided weekly, supervised visitation for both parents.[11]

---

[10] *People v. Pope*, *supra*, 23 Cal.3d at page 426 was overruled on other grounds, as recognized in *People v. Berryman* (1993) 6 Cal.4th 1048, 1081, footnote 10, which also was overruled on other grounds in *People v. Hill* (1998) 17 Cal.4th 800, 823, footnote 1.

[11] Mother's counsel stated at the disposition hearing that mother had "read and received the second addendum report. . . . There's been a lot of processing on the (continued)

25

Information in the October 29 addendum report suggests that inasmuch as further investigation might have resolved any implication of direct responsibility for child's fractures, it might have further damaged mother's remaining credibility and increased the potential for finding culpability under the indirect infliction prongs of section 300, subdivisions (e) and (i) as alleged in the petition. We refer specifically to mother's statements to the social worker that she knew that grandmother resented child since the time of mother's pregnancy, that grandmother "angered easily" and "is sick and . . . needs help," and that child's tendency to cry whenever grandmother tried to hold child as a baby was hurtful to grandmother. The October 29 addendum report documents that the facilitator of mother's then 52-week child abusers treatment program reported that mother had announced during her last group session that she knew of grandmother's propensity for violence toward child and had told the group that she had left the home at one point to protect child.

Also troubling for mother are the facts of the incident in which grandmother reportedly threw child—then seven months old—onto the couch to hurt mother. Mother told the social worker that the incident occurred "slightly before Thanksgiving," when grandmother "grabbed" child by the torso and threw her onto the couch. Based on mother's dating of the incident, it occurred shortly before the window that Dr. Hyden's testimony identified as the likely timeframe for child's rib and hip fractures (10 days up to one month before the December 31, 2014 hospital visit for child's ankle injury). The proximity in time of the hip and rib injuries to this incident logically raises questions regarding mother's testimony that she was the sole caretaker for child when child sustained her injuries, as well as mother's confidence in grandmother's caretaking and

mother's part over the last week especially. She is willing to do whatever it takes to reunify with [child]." Counsel described the perceived benefits of mother starting counseling, and mother's willingness to receive psychological evaluation and to continue the parenting program. "With those comments we are submitting today."

26

mother's tendency—documented throughout the record—to defer to and rely on grandmother and to follow grandmother's lead in caring for child.

In addition, the October 29 addendum report contained grandmother's explanation to the social worker that after she stepped on child's ankle in anger, child "was crying louder than she had ever cried before and was difficult to console." This statement creates potential credibility problems for mother, who told the police in the investigation on December 31, 2014, that she was sleeping on the floor in the living room when child fell off the couch, yet presumably knew nothing. Mother repeated at the jurisdiction hearing that she had no explanation for what happened to child. The social worker kept the recommendation for child's removal in the October 29 addendum report despite grandmother's confession and mother's "clear . . . love" for child and "genuine concern for [child]'s wellbeing," noting "[mother's] lack of ability to protect [child] from the maternal grandmother. . . ."

Given the range of adverse inferences to be drawn from mother's knowledge of grandmother's resentment toward child and from mother's failure to disclose a disturbing incidence of violence toward child, we cannot conclude that counsel's failure to seek a new jurisdiction hearing was not a reasonable tactical decision. (Cf. *Kristin H*., *supra*, 46 Cal.App.4th at p. 1671 [evidence in the record and attached to a writ petition revealed "no practical or tactical reason" for counsel's failure to bring a favorable medical report to the court's attention].) "To prove deficient representation, [the parent] 'must "affirmatively show that the omissions of . . . counsel involved a crucial issue, *and that the omissions cannot be explained on the basis of any knowledgeable choice of tactics*." ' " (*In re Dennis H*., *supra*, 88 Cal.App.4th at pp. 98-99, italics added, quoting *People v. Jackson* (1980) 28 Cal.3d 264, 289, disapproved on other grounds by *People v. Cromer* (2001) 24 Cal.4th 889, 901, fn. 3.)

In sum, we find on the record both before and as a result of the October 29 addendum report that mother has not satisfied her burden to establish "no satisfactory

explanation" for her trial counsel's failure to seek a new trial on jurisdiction.  (See *In re Eileen A.*, *supra*, 84 Cal.App.4th at p. 1254; *People v. Pope*, *supra*, 23 Cal.3d at p. 425.) Accordingly, we need not determine whether counsel's inaction was prejudicial to the outcome at the disposition hearing under either the statutory or constitutional due process standards.

**III.      DISPOSITION**

The judgment of the juvenile court is affirmed.

_____

                    Premo, J.

WE CONCUR:

_____

          Rushing, P.J.

_____

          Grover, J.